IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, JACKSON HOLE CONSERVATION ALLIANCE SIERRA CLUB, WYOMING WILDERNESS ASSOCIATION, DEBRA PATLA, and MERLIN HARE,<br><br>Plaintiffs,<br><br>v.<br><br>LARRY TIMCHAK, Supervisor of the Caribou-Targhee National Forest; CAROLE HAMILTON, Supervisor of the Bridger-Teton National Forest; and the UNITED STATES FOREST SERVICE,<br><br>Defendants.<br>_____<br><br>HIGH MOUNTAINS HELICOPTER SKIING, INC.,<br><br>Defendant-Intervenor<br>_____ | Case No. CV-06-04-E-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment. The Court heard oral argument on October 30, 2006, and took the motions under advisement.

**Memorandum Decision and Order – Page 1**

For the reasons expressed below, the Court will grant in part the motion filed by Greater Yellowstone and deny the motion filed by the Government.

## FACTUAL BACKGROUND

High Mountains transports skiers to backcountry mountaintops by helicopter. It operates under a Forest Service permit in the mountain ranges around the Idaho/Wyoming border. When its permit expired, High Mountains sought a renewal that would authorize an increased level of heli-skiing. After conducting environmental studies, the Forest Service issued a permit that authorized most of the additional use sought by High Mountains. This lawsuit challenges the issuance of that permit. The plaintiffs will be collectively referred to as Greater Yellowstone.

The permit allows High Mountains to operate in a 70-square-mile area that includes the Bridger-Teton National Forest and the Caribou-Targhee National Forest. The permit authorizes 1,200 "service days" of heli-skiing. A service day is defined as the provision of heli-skiing for "1 client for any portion of a day." *See Final Environmental Impact Statement (FEIS)* at p. 1.

High Mountains flies skiers to a ridge top and then picks them up after their ski run and ferries them back to the ridge top for another run. *Id*. at p. 3. The skiers complete six or seven runs a day. *Id.* With an average of 14 clients per day,

**Memorandum Decision and Order – Page 2**

1,200 service days would generate about 86 helicopter days. *Id*. at p. 83. Because there are only about 56 days of favorable weather for heli-skiing in a typical winter, *id.* at p. 4, this means that two helicopters would be needed at least part of the time. *Id*. at p. 83.

It is common for High Mountains to operate all day within the same drainage. *Id*. at p. 70. This usage pattern means that "helicopter noise would be common throughout the day in that drainage." *Id*. If the pilot needs to refuel the helicopter, he will fly to a back-country fuel tank where High Mountains maintains a cache of fuel. *Id*. at p. 3.

Before the operating season, and prior to some runs, High Mountain drops explosives from its helicopters to assess snow pack stability. *Id*. at p. 4. In an average 122-day winter season, High Mountain uses explosives on about eleven days, typically after severe weather. *Id.* at p. 70. The explosives are not used if recreationists or wildlife are observed in the vicinity. *Id*. at p. 4.

Prior to 1984, High Mountain operated in the Gros Ventre Range, the Snake River Range, the Wyoming Range, and the west slope of the Tetons. In 1984, Congress passed the Wyoming Wilderness Act, designating eight areas as Wilderness and three others as Wilderness Study Areas (WSAs). One of the WSAs is the Palisades WSA, a 180,000 acre area on the Wyoming side of the

**Memorandum Decision and Order – Page 3**

Palisades Range.  Because the Palisades WSA spreads through both the Caribou-Targhee and the Bridger-Teton National Forests, it is managed by both.

While heli-skiing is permitted in WSAs, it is banned in areas designated as Wilderness.  The Act's Wilderness designations resulted in High Mountains losing all of their terrain on the West Slope of the Tetons (now part of the Jedediah Smith Wilderness) and the vast majority of the ski area in the Gros Ventre Range (now the Gros Ventre Wilderness).  *Id*. at p. 5.  This lost area constituted about one-third of High Mountains' permit area.  *Id*. at p. S-1.  Over the next two decades, High Mountains increased its operations in the Palisades area.  In 2004, the owners of High Mountains estimated that about 98% of its operations were being conducted in the Palisades WSA.  *See AR* at 2816 (estimate that 98% "of our remaining skiable terrain is within the Palisades WSA").   While High Mountains' permit authorized 400 service days in 1983-84, the authorized use increased to 468 in 1991-92, and jumped to 900 in 2000-01.

When its permit expired in 2001, High Mountains sought another increase to 1,500 service days.  It then operated under a series of temporary permits as the Forest Service prepared an Environmental Impact Statement to examine High Mountains' proposal.  In 2005, the Forest Service issued a Record of Decision (ROD) and FEIS approving a ten-year permit authorizing 1,200 service days of

**Memorandum Decision and Order – Page 4**

heli-skiing over a 305,000 acre area, including the Palisades WSA.  As discussed above, about 98% of this heli-skiing will occur in the Palisades WSA.

Plaintiff Greater Yellowstone filed this action to challenge the FEIS and ROD under the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Wyoming Wilderness Act.  Greater Yellowstone now seeks summary judgment on these claims.  The Forest Service responded with a cross-motion, arguing that the FEIS and ROD pass muster under all three statutes.

## ANALYSIS

**1.      Wyoming Wilderness Act & Palisades WSA**

The Wyoming Wilderness Act requires the Forest Service to administer the Palisades WSA "so as to maintain [its] presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System." § 301(c), 98 Stat. At 2811.  The parties agree that this language imposes a duty on the Forest Service to administer the Palisades WSA to maintain (1) the "wilderness character" that existed there in 1984, and (2) its "potential for inclusion in the National Wilderness Preservation System."

It is the first duty that is at issue in this case.  The Wyoming Wilderness Act was passed in 1984.  Thus, when Congress directed the Forest Service to maintain

**Memorandum Decision and Order – Page 5**

the WSA's "presently existing" wilderness character, it meant the character existing in 1984. And to "maintain it" means to preserve it – to not authorize any use that would diminish the wilderness character of the Palisades WSA as it existed in 1984. Finally, while the term "wilderness character" is not defined in the Wyoming Wilderness Act, the Forest Service borrowed the definition of wilderness from the 1964 Wilderness Act, defining wilderness as an area that has, among other things, "outstanding opportunities for solitude or a primitive and unconfined type of recreation." *See FEIS* at p. 79 (borrowing the definition from 16 U.S.C.§ 1131(c)).

This provision of the Wyoming Wilderness Act is written clearly, without ambiguity. It requires the Forest Service to administer the Palisades WSA to maintain the opportunities for solitude or primitive and confined recreation that existed there in 1984. The FEIS understood this meaning when it concluded that "[t]he key aspect of wilderness character affected by heli-skiing is the opportunity for solitude or primitive recreation." *See FEIS* at p. 78.

The FEIS recognized that loud helicopter flights could be inconsistent with solitude: "Heli-skiing affects the opportunity for solitude and the opportunity for primitive recreation since it introduces a form of motorized travel and the noise disrupts the natural quiet important to the opportunity to experience solitude." *Id*.

**Memorandum Decision and Order – Page 6**

at 79.  To measure this disruption, the Forest Service examined two criteria: "This effect is measured in terms of the percent of the WSA used by heli-skiing (spatial effect) and the percent of the winter season (December 15-April 15) helicopters would be present within the WSA (temporal effect)." *Id*.

The FEIS estimated the spatial and temporal effect of four different levels of heli-skiing: (1) Alternative A (the "no action" alternative, assuming that no permit was issued); (2) Alternative B (allowing 468 service days, 400 days of which would occur in the Palisades WSA); (3) Alternative C (allowing 1,000 service days); and (4) Alternative D (the proposal of High Mountains allowing 1,500 service days).  *Id*. at pp. 81-84.  The FEIS proposed to compare the effects (spatial and temporal) of each level of use "against the wilderness 'character' present within the Palisades WSA when the Wyoming Wilderness Act was passed in 1984," *Id*. at 78.

That is precisely what the Wyoming Wilderness Act required.  If the FEIS had followed through on its proposal, this case would be over.

However, that was not done.  While the FEIS contains a paragraph discussing the 1984 wilderness character, *see FEIS* at p. 79, it is very general, contains no specific discussion of motorized use in 1984, and, most importantly, is never referred to again as a benchmark for comparison.

**Memorandum Decision and Order – Page 7**

While there is another section purporting to discuss helicopter use levels in 1984, the Forest Service now disavows that interpretation. The section at issue is the FEIS's description of Alternative B, proposing 468 service days: "This figure represents the *amount of use* that generally occurred in the mid-1980s *when the Palisades area was designated as a [WSA]*." *Id*. at S-3 (emphasis added). That sounds like a representation that 468 service days was the approximate level of usage in the Palisades area in 1984.

However, the Forest Service backs away from this interpretation. In its briefing, the Forest Service states that "Alternative B was not used as a baseline." *See Forest Service Brief in Opposition to Summary Judgment* at p. 9. It further asserts that "[r]egardless of what the actual amount of use in the Palisades was in 1984, the number was encompassed in the considered range of alternatives." *Id*. at p. 11.

It is clear that Alternative B does not represent the 1984 service day level. The entire region – including the Wyoming, Teton, and Gros Ventre Ranges, as well as the Palisades area – had an "Authorized Use" of only 400 service days in the winter of 1983-84, according to the FEIS. *See FEIS* Table 1-2 at p. 5. Given the FEIS's conclusion that 84% of High Mountains' operations occurred in the Teton and Gros Ventre Ranges during the winter of 1981-82, *id*. at p. 81-82, and

**Memorandum Decision and Order – Page 8**

the lack of any evidence of changes in use over the next two winters, the level of use in 1983-84 in the area now comprising the Palisades WSA must have been far below 400 service days.

And indeed it was.  High Mountains' own report states that the "Snake River Range" area saw 57 "skier-days" of helicopter use in the winter of 1981-82.  *See AR* at p. 13,430.[1]  This is the same area now comprising the Palisades WSA.  *See FEIS* at p. 2.  While this report predates the 1983-84 winter by two years, usage in the entire region changed little over that time, *see* Table 1-2, and thus usage in the area now comprising the Palisades WSA must have remained about the same.

This makes a big difference to the Forest Service's calculation of its two critical variables – spatial and temporal effects.  At the 1,200 service day level, at least one helicopter will be flying on all 56 days of favorable weather in a typical winter (the temporal effect), *id*. at p. 82.  In contrast, the 1984 level was 5 days (assuming 57 service days and a 14-passenger helicopter).  Thus, the temporal effect is increased ten-fold over 1984.

With regard to the spatial effect, the 1,200 service day level would use about

---

[1] The term "skier days" appears to have the same definition as "service days." Greater Yellowstone so assumed in its briefing and no objection was raised by High Mountains or the Forest Service.

**Memorandum Decision and Order – Page 9**

20% of the WSA,[2] while the 57 service day level would use about 2% of the WSA.[3]  Thus, the spatial effect, just like the temporal effect, is increasing ten-fold.

This comparison was not conducted in the FEIS.  Helicopter use is a critical component of wilderness character.  To determine if that character is being maintained, a ten-fold increase in the spatial and temporal effects of helicopter use must be (1) identified and (2) discussed.

The Court is not holding that the ten-fold increase is automatically fatal.  Helicopter use is but one component of wilderness character, albeit a critical one.  If the FEIS had discussed how the overall 1984 wilderness character – that is, the opportunities for solitude and primitive recreation – would be maintained by the 1,200 service day level, despite the ten-fold increase in the effects of helicopter use, the FEIS would comply with the Wyoming Wilderness Act.  However, that analysis is missing.  In other words, the FEIS does not follow through on its promise to "compare the effects (spatial and temporal) of each level of use "against the wilderness 'character' present . . . in 1984," *Id*. at 78.

---

[2] The FEIS estimated that 1,000 service days would use 15% of the WSA, *id*. at p. 83, while 1,500 service days would use 31%. *Id*. at p. 84.  The 20% figure set forth above is calculated by averaging these figures.

[3] The FEIS estimated that 400 service days would use 6% of the WSA.  A usage level of 57 service days – about one-seventh of the 400 service day level – would generously translate to a spatial effect that would include about 2% of the WSA.

**Memorandum Decision and Order – Page 10**

The Forest Service alleges that it did engage in this analysis when it determined that heli-skiing would take place in areas too remote and rugged for those seeking solitude. The Forest Service points to the ROD, which concluded that "rugged topography and distance from trailheads creates a situation in which only a few non-motorized backcountry users even reach most of the terrain used by High Mountains." *ROD* at p. 8.

The Forest Service is relying here on (1) lack of use, and (2) inaccessibility. A lack of use is not determinative. It is the "opportunity" for solitude that must be maintained under the Act. This means that if an area could be accessed for solitude in 1984, it must be maintained as such today, even if rarely used.

However, if the lack of use is caused by inaccessibility, the Forest Service's argument gains strength. That is, if nobody can reach areas where the helicopters will be seen and heard, "opportunities" for solitude will not be diminished.

The FEIS contains no analysis that would inform the public and Court whether the ten-fold increase in spatial and temporal effects will occur in areas that are inaccessible. It does observe that "the area in which [High Mountains] has authorized use is remote and beyond the reach of most skiers who are out for a day." *See FEIS* at p. 62. But the next sentence states that "[s]ome backcountry use occurs within the area," *id.*, indicating that while the area may be little used, it is

**Memorandum Decision and Order – Page 11**

accessible.

That conclusion is reinforced by the FEIS's discussion of Alternatives. The Selected Alternative of 1,200 service days represents an amalgam of Alternative C and D. In Alternative D, the FEIS concludes that "[o]ther users would have a higher probability of encountering [High Mountains'] operations," and, compared with Alternative C, "any current or future backcountry skiers in this area would have an increased likelihood of encountering the background noise of helicopters." *FEIS* at p. 75.

Alternative C proposes fewer service days and closes certain areas to High Mountains but nevertheless concedes the potential for interference: "Additionally, it is expected that [High Mountains] would increase use at some of the locations within the area that currently receive moderate or light use, and others would have a higher probability of encountering [High Mountains'] operations and attendant noise." *Id.* at p. 73.

This discussion indicates that areas within the flight paths are accessible. The key flaw, however, is the failure of the FEIS to inform the public and the Court of whether the ten-fold increase in spatial and temporal effects will occur in inaccessible areas. If the ROD so concludes, it is pulling its finding out of thin air, because there is support for that in the FEIS.

**Memorandum Decision and Order – Page 12**

Finally, the Court turns to the standard used by the FEIS and ROD in their analysis. The FEIS explains that to meet the "direction" of the Wyoming Wilderness Act, "managers cannot allow uses and activities to increase to the point where little to no opportunity for solitude and primitive recreation *remains*." *See FEIS* at p. 80 (emphasis added). This mis-states the standard set by Congress. The Act does not direct the Forest Service to ensure that solitude "remains," but instead requires that it be "maintained" at it existed in 1984.

The FEIS compounds the problem by crafting its own standard that examines whether opportunities for solitude are "readily available throughout most of the WSA most of the time . . . ." *Id.* Relying on this standard, the ROD approved the 1,200 service day level because the "vast" permit area provided "ample opportunities" for non-motorized users to "recreate away from heli-skiing operations." *See ROD* at p. 8.

While this Court must defer to an agency's expertise, the Court has a duty to "reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A., Inc. v. N.R.D.C., Inc.*, 467 U.S. 837, 843 n.9 (1984). The Forest Service's construction of the Act is contrary to its language. That construction would permit the 1984 wilderness character to be diminished so long as that character was still available "throughout most of the WSA most of the

**Memorandum Decision and Order – Page 13**

time." However, the Act abides no diminishment, however much is left. The Forest Service's re-working of the Act's language must therefore be rejected.

By mandating that the 1984 character be maintained, the Act requires that all proposed actions be compared to a 1984 baseline. The Forest Service's mis-statement of the standard explains the lack of any comparison with a 1984 baseline in the FEIS and ROD.

The Court does not disagree with the Forest Service's assertion that "ample" opportunities for solitude will remain in most of the Palisades WSA most of the time. *See ROD* at p. 8. Indeed, it is obvious that a great deal of dedicated work went into the FEIS and ROD. These reports display a careful attempt to weigh and balance various competing interests. For example, the agency backed off from High Mountains' 1,500 proposal because of "concerns about wildlife displacement . . . and conflicts with non-guided winter recreation users," *id*. at p. 2, yet kept the level high enough to "accommodate [a] growing public desire for this service." *Id*. This segregation of uses will ensure that "opportunities for solitude or primitive recreation will still be available within the WSA" and that the decision "allows the managed growth of heli-skiing operations . . . ." *Id.* at p. 9.

The Court does not take issue with these conclusions. This balancing of competing interests – "growth management" – is the traditional province of the

**Memorandum Decision and Order – Page 14**

Forest Service. *See NRDC v. U.S. Forest Service*, 421 F.3d 797, 801 (9th Cir. 2005) (discussing "obligati[on] [of] the Forest Service to balance competing demands on national forests"). If the land at issue was typical National Forest property, the Forest Service's careful analysis would be commendable.

However, the standard here is different. The Palisades WSA has been carved out by Congress for special protection. Public demand for heli-skiing, the balancing of competing interests, and "managed growth" are not the governing standards under the Wyoming Wilderness Act. Instead, Congress has directed the Forest Service to maintain the 1984 wilderness character of the area. That is the primary duty of the Forest Service, and it must guide all decisions as the first and foremost standard of review for any proposed action.

This is not to say that heli-skiing must be limited to the 1984 level of 57 service days. The Act does not dictate that "service days" must be maintained; it is the 1984 "wilderness character" – the opportunities for solitude at that time – that must be maintained.

This mandate requires an extensive discussion of the 1984 wilderness character, and then a thorough analysis comparing the proposed action with that 1984 baseline. Once it is determined that the proposed action will maintain that 1984 wilderness character, and only at that point, the Forest Service may engage in

**Memorandum Decision and Order – Page 15**

its traditional balancing-of-interests analysis.

The analysis required by the Act was not done here. Accordingly, the FEIS and ROD violate the mandate of Congress contained in the Wyoming Wilderness Act. The Forest Service decision to issue a permit to High Mountains is therefore arbitrary and capricious under the Administrative Procedures Act, 5 U.S.C. §706(2)(A).

## 2. NEPA

The "hard look" required by NEPA is not satisfied when the agency relies "on incorrect assumptions or data in an EIS." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 964 (9th Cir. 2005). Here, the FEIS relies on an inaccurate representation in Alternative B. As discussed above, that Alternative represented that its proposed usage level represented the level in 1984. While the Forest Service now claims that is a mis-interpretation, any member of the public reading the FEIS would have been misled. This is a crucial inaccuracy because it would have overstated helicopter use in 1984 and consequently underestimated the increased impacts in the present. For this reason, the FEIS and ROD violate NEPA.

## 3. NFMA

The standard in the Caribou-Targhee Forest Plan is basically the same as the Wyoming Wilderness Act. The Court finds persuasive Greater Yellowstone's

**Memorandum Decision and Order – Page 16**

argument that the FEIS and ROD authorize an increase from 14 to 420 service days. There is no discussion in the FEIS or ROD concerning how this increase complies with the Forest Plan. Accordingly, the Court finds a violation of NFMA. *See Western Watershed Project v. U.S. Forest Service*, Civ.No. 05-189-E-BLW (Memorandum Decision February 7, 2006)(Winmill, J.).

2.   **Remedy**

The standard remedy for violation of congressional legislation would be an injunction. *High Sierra Hikers Assoc. v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (holding that "irreparable injury flows from the failure to evaluate the environmental impact of a major federal action"). The Court could enjoin High Mountain from conducting any heli-skiing in the Palisades WSA and Caribou-Targhee National Forest until the Forest Service conducts a proper analysis and a new permit is issued. The Court will not do so at this time for the reasons expressed below.

4.   **Conclusion**

The Court has struggled over this case. The Administrative Record shows that High Mountains has an impeccable operating history spanning thirty years. Their record of safety and compliance with Forest Service directions is outstanding. The public demand for their service supports expansion, and their

very ability to survive hinges on serving more clients.  Moreover, the Forest Service's approval was the result of an impressive review that skillfully balanced competing interests.

Under these circumstances, the Court would normally defer to the agency's expertise.  However, the Palisades WSA has been carved out by Congress for special protection.  While that protection is less than a full Wilderness designation would require, it is more than that accorded to National Forests at large.  According to Congress, the opportunities for solitude that existed in 1984 must be maintained.  This requires a special analysis that has never been conducted.  Until that special analysis is done, no permit can be issued and an injunction is warranted.

Enjoining heli-skiing now, on the eve of the skiing season, would drive High Mountains out of business.  Recognizing the draconian nature of such a remedy, Greater Yellowstone has offered to negotiate a remedy.  A settlement is preferable to a court-imposed remedy because the parties have available to them a much broader array of alternatives than the Court, which is confined to the relatively few options offered by law.  The Court would urge the parties to reach a resolution.  However, if unable to do so, they may return here to seek relief.  In this decision, the Court finds that the FEIS and ROD violate the Wyoming Wilderness Act,

**Memorandum Decision and Order – Page 18**

NEPA, and NFMA, but will not impose any remedy at this time to give the parties time to negotiate one.

## ORDER

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the plaintiffs' motion for summary judgment (Docket No. 37) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks a ruling that the FEIS and ROD violate the Wyoming Wilderness Act, NEPA and NFMA.  It is denied as to remedy at this time to allow negotiations between the parties, without prejudice to Greater Yellowstone's right to seek injunctive relief if negotiations between the parties break down.

IT IS FURTHER ORDERED, that the Government's motion for summary judgment (Docket No. 44) is DENIED.

IT IS FURTHER ORDERED, that the motion to file additional citations (Docket No. 59) is DEEMED MOOT.

**Memorandum Decision and Order – Page 19**

IT IS FURTHER ORDERED, that the motion to strike in lieu of answer (Docket No. 26) be DENIED.



DATED:  **November 21, 2006**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge